# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERTA LYNN DINWIDDIE, | Case No.  1:15-cv-01007-AWI-SAB |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | (ECF Nos. 14, 15, 16) |
| Defendant. | OBJECTIONS DUE WITHIN FOURTEEN DAYS |

## I.

## INTRODUCTION

Plaintiff Roberta Lynn Dinwiddie ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The action was referred to the magistrate judge pursuant to Local Rule 302(c) and 28 U.S.C. § 636(b).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.

Plaintiff suffers from cardiomyopathy, peripheral neuropathy, spine disorders, chronic obstructive pulmonary disease ("COPD"), obesity, hypertension, and anxiety disorder.  For the reasons set forth below, it is hereby recommended that Plaintiff's Social Security appeal be denied.

1

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on March 16, 2012; and a Title II application for disabled widow's benefits on April 26, 2012. (AR 104, 105, 106.) Plaintiff's applications were initially denied on June 28, 2012, and denied upon reconsideration on February 4, 2013. (AR 149-153, 154-159, 163-167, 168-172.) Plaintiff requested and received a hearing before Administrative Law Judge Susanne Lewald ("the ALJ"). Plaintiff appeared for a video hearing on February 6, 2014. (AR 39-65.) On March 10, 2014, the ALJ found that Plaintiff was not disabled. (AR 9-23.) The Appeals Council denied Plaintiff's request for review on May 7, 2015. (AR 1-3.)

### A.     Hearing Testimony

Plaintiff testified at the February 6, 2014 hearing. (AR 42-46, 51-57, 58.)

Plaintiff lives with her daughter. (AR 46.) Plaintiff is about five foot six inches tall and weighed about one hundred ninety pounds the last time she got on the scale. (AR 55.)

Plaintiff testified that on an average day she gets up and does what housework she can. (AR 43.) Plaintiff can stand for a bit and do dishes. (AR 43.) If she bends down to pick things up off the floor she will get bad back pain. (AR 43.) Plaintiff will sit down when her feet start hurting her really badly, or go and lie down and put her feet up. (AR 43.) Plaintiff will get back up and do more. (AR 43.) This continues throughout the day. (AR 43.) It takes Plaintiff two to three times as long to accomplish tasks because she has to sit down and get off her feet. (AR 43.)

Plaintiff is able to vacuum, but does not do much sweeping. (AR 43.) Plaintiff is able to do laundry. (AR 43.) Plaintiff is able to carry two gallons of milk, one in each hand. (AR 44.) Plaintiff has two steps that she climbs to get into her house. (AR 44.) When she tries to carry too much she gets short of breath when she climbs the stairs. (AR 44.) Plaintiff has never been hospitalized related to her COPD or difficulty breathing. (AR 55.) Plaintiff is able to walk several blocks. (AR 55.)

Plaintiff has a sharp pain and numbness in the bottom of her feet.  (AR 44.)  She feels like a bunch of needles are poking the bottom of her feet.  (AR 45.)  Plaintiff does not need a cane to walk.  (AR 45.)  When she has been on her feet more than normal they will bother her at night.  (AR 45.)  When that happens she shakes her feet until she falls asleep.  (AR 45.)  For the past four years, Plaintiff has to take four or five rest breaks during the course of an average day if she is up or helping out.  (AR 53.)  She takes a rest break of thirty to forty-five minutes where she puts her feet up.  (AR 53-54.)  These breaks are needed due to her feet or problems with her back.  (AR 53.)  There are no activities that aggravate her symptoms.  (AR 53.)  If Plaintiff is on her feet too long she starts stumbling around and she gets wobbly at night if she pushes herself.  (AR 53.)

Plaintiff does not receive any treatment for mental health issues because she does not have medical insurance.  (AR 55.)  Plaintiff has panic attacks that wake her up out of her sleep.  (AR 56.)  Plaintiff has panic attacks day and night.  (AR 56.)  She does not know what triggers them, but they happen more often when she is stressed out.  (AR 56.)  Plaintiff has panic attacks three to five times per week that last about twenty minutes.  (AR 57.)  Plaintiff has taken medication in the past for anxiety.  (AR 56.)

Plaintiff last worked in February 2009 doing janitorial work.  (AR 45.)  She stopped because her health was going downhill.  (AR 45.)  Plaintiff worked five days per week.  (AR 45.)  On her long days she would travel between businesses.  (AR 45.)  Plaintiff looked for work after she stopped working in 2009 but was unable to find work.  (AR 51.)

Plaintiff has previously worked as a cashier, janitorial, in-home care, dispatching, and babysitting.  (AR 51.)  Plaintiff worked as a dispatcher for U-Haul.  (AR 51.)  She worked from five in the evening until seven or eight in the morning.  (AR 51-52.)  Plaintiff would receive calls regarding customers who had rented a U-Haul which had broken down.  (AR 52.)  She would call the customer and confirm the information received was correct and then dispatch a mechanic, tow truck, or have the customer put up for the night.  (AR 52.)  Plaintiff worked out of her home and did not use a computer on the job.  (AR 52, 58.)  All communication was by telephone.  (AR 58.)  Plaintiff was paid by the number of breakdowns that she handled.  (AR 52.)

1   Plaintiff worked at this job part time for five years making more than $500.00 per month.  (AR
2   52-53.)

3        Plaintiff worked as in-home support cleaning the house, cooking meals, taking out the
4   garbage, administering medication, and taking the client to doctor appointments.  (AR 54-55.)
5   Plaintiff would do whatever needed to be done: mop the floor, vacuum, dust.  (AR 54-55.)

6        Plaintiff is most bothered by her shortness of breath because her chest will start to hurt a
7   little bit.  (AR 45-46.)  Plaintiff takes medication for cholesterol.  (AR 46.)  Plaintiff used to take
8   medication for her peripheral neuropathy, but does not currently because she has to save money
9   for her medication.  (AR 46.)  Plaintiff last used methamphetamines in 2001.  (AR 55.)

10       Based on the testimony at the hearing and his review of the medical record, Dr. Wallach
11  determined that Plaintiff had two medically determinable physical impairments:  peripheral
12  neuropathy and diastolic heart failure.  (AR 46-47.)  Plaintiff's diastolic heart failure does not
13  meet the listing because she does not meet the left ventricular wall size of 2.5 centimeters, but
14  she does have symptoms with would make her class II heart failure.  (AR 47.)  Dr. Wallach
15  opined that Plaintiff would equal the listing for 4.02.  (AR 47.)  Dr. Wallach relied on exhibit 3-F
16  for neuropathy, back pain, and below knee.  (AR 47.)

17       The ALJ questioned Dr. Wallach because the records described sensory neuropathy, but
18  nothing that interferes with motor function.  (AR 47.)  The record showed abnormal sensation in
19  the toes but normal muscle bulk and tone and motor strength in bilateral upper and lower
20  extremities which would be a medium residual functional capacity.  (AR 47.)  Dr. Wallach
21  reviewed the record and opined that Plaintiff did not meet the listing.  (AR 48.)  Dr. Wallach
22  opined that Plaintiff stated she can lift ten pounds, but that she could not climb ladders and
23  should not work around machinery.  (AR 48.)  Plaintiff should not crouch, stoop, or kneel.  (AR
24  48.)  Plaintiff would need to get up every hour for five to ten minutes when sitting.  (AR 48.)
25  Plaintiff would be able to stand or walk two hours combined out of an eight hour period.  (AR
26  48.)

27       The ALJ questioned Dr. Wallach on the November 2013 hospital records which indicate
28  minor severity of illness.  (AR 49.)  Dr. Wallach stated that Plaintiff is on two medications for

heart failure and class II heart disease is symptoms on moderate exercise.  (AR 49.)  The first mention of heart failure is January 10, 2012.  (AR 49.)  The limitation to sedentary work would be due to Plaintiff's heart failure and the residual functional capacity opined by Dr. Wallach would not be prior to January 10, 2012.  (AR 50.)  Prior to that date she would have been able to do work a full day with rest breaks.  (AR 50.)  When she was having difficulty she would have had to get up five to ten minutes every hour.  (AR 50.)

A vocational expert, Marilyn Kinnier, also testified at the hearing.  (AR 57-64.)

**B.    ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2013.

- Plaintiff has been previously found to be an unmarried widow of a deceased insured worker and has attained the age of 50.  Plaintiff met the non-disability requirements for disabled widow benefits.

- The prescribed period ends on August 31, 2014.

- Plaintiff has not engaged in substantial gainful activity since the alleged date of onset of September 11, 2010.

- Plaintiff has the following severe impairments: COPD, tobacco addiction, obesity with a BMI over 35, peripheral neuropathy of unknown etiology, and angina pectoris.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform light work except that she is limited to stand and/or walking short distances up to six hours out of an eight hour day; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps or stairs, and perform other postural activities; and have no exposure to concentrated dust, fumes, smoke, or similar respiratory irritants.

- Plaintiff has no past relevant work.

- Plaintiff was born on September 11, 1960, and was 51 years old on the alleged disability onset date, which is defined as an individual closely approaching advanced age.

- Plaintiff has a limited education and is able to communicate in English.

- Transferability of job skills is not an issue because Plaintiff has no past relevant work.

- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability, as defined in the Social Security Act, from September 11, 2010 through the date of decision.

(AR 15-22.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520;[1] Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.

Step two: Is the claimant's alleged impairment sufficiently severe to limit his or

---

[11] Plaintiff has raised claims under both the Supplemental Security Income and Disability Insurance Benefits regulations. The regulations are virtually identical and are set forth in two separate sections, 20 C.F.R. §§ 416.900-416.999 and 20 C.F.R. §§ 404.1500 -404.1599. The Court shall refer to the regulations under 20 C.F.R. 404.1500 et seq. when addressing the relevant regulations in this action.

her ability to work? If so, proceed to step three. If not, the claimant is not disabled.

Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error."  Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).   "Substantial evidence" means more than a scintilla, but less than a preponderance.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

/ / /

# IV.

## DISCUSSION AND ANALYSIS

Plaintiff contends that the ALJ erred in evaluating her testimony and finding her to be not credible. Defendant responds that the ALJ appropriately evaluated the record and provided clear and convincing reasons to find Plaintiff's testimony not credible.

### A.    The ALJ Provided Clear and Convincing Reasons for the Adverse Credibility Finding

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted). Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted). This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms. Smolen, 80 F.3d at 1282.

Second, if the first test is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of her symptoms by offering "clear and convincing reasons" for the adverse credibility finding. Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1160 (9th Cir. 2008). The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted). Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or

aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, at 1040; Thomas, 278 F.3d at 958.  In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . . ."  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).

The ALJ considered Plaintiff's allegations that panic attacks, congestive heart failure, high blood pressure, and cholesterol problems kept her from working.  (AR 17.)  Plaintiff's documented subjective complaints included chest pain radiating to her neck, low back pain, numbness in her feet (left greater than right), with pain at times in the lateral thighs, shortness of breath, wheezing, orthopnea, daily panic attacks, difficulty sleeping, social isolation, lack of pleasure in things she used to enjoy, and difficulty in handling stress or changes in routine.  (AR 17.)  Plaintiff reported that she could stand for 30 minutes, walk 3 blocks, and lifting 20 to 30 pounds aggravated her low back pain.  (AR 17.)

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but her statements regarding the intensity, persistence, and limiting effects of the symptoms was not entirely credible.  (AR 17.)  Specifically, the ALJ found that Plaintiff's credibility is undermined because 1) the documented objective medical evidence, including those general normal clinical findings and her daily activities are inconsistent with her alleged limitations; 2) Plaintiff has reported similar symptoms since prior to the alleged disability onset date; 3) Plaintiff has a history of noncompliance with medication, and breathing difficulties that have coincided with that noncompliance and has continued to smoke cigarettes and marijuana despite her treating providers recommendations to quit smoking; and 4) Plaintiff stopped working significantly prior to the alleged disability onset date and continued to look for work.  (AR 19.)

/ / /

1. <u>Objective Medical Evidence</u>

The determination that a claimant's complaints are inconsistent with clinical evaluations can satisfy the requirement of stating a clear and convincing reason for discrediting the claimant's testimony. <u>Regennitter v. Commissioner of Social Sec. Admin.</u>, 166 F.3d 1294, 1297 9th Cir. 1999). The ALJ properly considered the evidence in weighing Plaintiff's credibility. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)).

Plaintiff completed a function report on May 25, 2012, and stated that her conditions affect her ability to lift, walk, climb stairs, squat, sit, stand, bend, kneel, and complete tasks. (AR 281.) Plaintiff stated she can stand about 30 minutes; walk 3 blocks and needs to rest for 10 minutes before she can resume walking; climbing stairs makes her chest hurt; and she has difficulty getting up when she squats or kneels. (AR 281.) At the February 6, 2014 hearing, Plaintiff testified that if she bends down to get things off the floor her back hurts bad. (AR 43.) Plaintiff testified that for the past four years she has had to take four to five rest breaks a day where she has to put her feet up due to her feet or problems with her back. (AR 53.) Plaintiff is most bothered by her shortness of breath because it causes her chest to hurt a little bit. (AR 45-46.)

The ALJ considered that Plaintiff had hospital records from June 2010 that noted "old evidence of a heart attack[.]" (AR 18.) On June 25, 2010, Plaintiff reported that she had some testing done which she was told showed evidence of an old heart attack. (AR 538.) Also prior to Plaintiff's alleged disability onset date, Plaintiff had an episode of mild tachycardia, mild tachypnea, and coarse breath sound bilaterally with some wheezing in March 2012. (AR 18.) Plaintiff's EKG showed reduced left ventricular ejection fraction of 25 percent in the context of pneumonia and congestive heart failure exacerbation with dilated cardiomyopathy, described as Class II-III symptoms. (AR 18.) Plaintiff's treating providers noted that this episode corresponded with noncompliance with treatment, including prescribed medications, and

1   Plaintiff was discharged after a one day hospital stay.  (AR 18.)

2       On March 8, 2012, the record reflects that Plaintiff was seen after having shortness of

3   breath for one week and some vague chest pain.  (AR 536.)  Plaintiff denied a history of cardiac

4   issues in the past.  (AR 536.)  Plaintiff had stopped taking her medication because she did not

5   have insurance.  (AR 536.)  An EEG showed some moderate mitral regurgitation.  (AR 537.)  An

6   EKG showed normal sinus rhythm with nonspecific T-wave changes.  (AR 537.)  A chest x-ray

7   showed congestion and Plaintiff was assessed with pneumonia, congestive heart failure

8   exacerbation with acute systolic dysfunction, dilated cardiomyopathy, COPD exacerbation,

9   tobacco addiction, poorly controlled hypertension, obesity, and noncompliance.  (AR 537.)

10       The ALJ also considered that since the alleged onset date cardiac enzyme and stress tests

11   have been negative, electrocardio gram ("EKG") readings have been nonspecific, and Plaintiff's

12   condition has been generally stable.  (AR 18, 597, 599, 601, 602, 631, 635, 638, 639, 647, 649,

13   663, 677, 679.)  Plaintiff's November 2013 EKG showed only mild or normal findings including

14   "good left ventricular function with an ejection fraction of about 55%," "mild diastolic left

15   ventricular dysfunction," "dilated left atrium," trace tricuspid regurgitation," "mild mitral

16   regurgitation," right ventricular systolic pressure of about 31 mmHg," with is essentially within

17   normal limits," no pericardial effusion," "no definitive evidence of mass, thrombus or

18   vegetation," and "atrial and ventricular septum appearing to be essentially within normal limits."

19   (AR 18-19, 664.)  Plaintiff's treating providers ruled out acute coronary syndrome and described

20   her impairments as minor in severity with no significant evidence of acute cardiopulmonary

21   disease.  (AR 19, 646, 647, 663.)  Plaintiff had a Lexiscan which was essentially negative.  (AR

22   647.)

23       The ALJ noted that Plaintiff's medical findings are consistent with a remote history of

24   nonischemic dilated cardiomyopathy with moderate LV systolic dysfunction without mention of

25   significant functional limitations.  (AR 18.)   On March 11, 2012, Plaintiff had a cardiac

26   consultation with Dr. Sharma.  (AR 539-540.)  The reason for the consultation is noted to be

27   nonischemic dilated cardiomyopathy.  (AR 539.)  Dr. Sharma notes that Plaintiff has a past

28   medical history of "moderate LV systolic dysfunction with moderate MR and TR secondary to

1    nonischemic dilated cardiomyopathy.  Previous angiography showed patent coronary arteries."
2    (AR 539.)  Plaintiff had a normal physical examination.  (AR 539.)  Dr. Sharma recommended
3    "[d]iuretics, beta blockers, and ACE inhibitors for nonischemic dilated cardiomyopathy
4    including abstinence from substance abuse."  (AR 540.)  The only mention that Court finds in
5    that records of Plaintiff's treating providers regarding physical activity is a June 25, 2010 note
6    which diagnoses mild diffuse calcific coronary artery disease and recommends an increase in
7    aerobic activity, she was provided with regular exercise instructions, and that she is to perform
8    activity as tolerated.  (AR 399, 553, 599.)

9         In respect to Plaintiff's neuropathy, the ALJ noted that prior to Plaintiff's alleged
10   disability onset date, a March 2010 nerve conduction study showed severe bilateral peroneal
11   motor neuropathy axonal on the left, absent motor potential on the right, moderate right post
12   tibial motor axonal neuropathy and mild right sural sensory neuropathy; however
13   electromyogram ("EMG") showed normal motor muscle findings.  (AR 19, 379-380, 381.)

14        Since Plaintiff's alleged onset date, the treatment records mentions some "unspecified
15   angina," decreased pinprick sensation below the knees, decreased light touch sensation and
16   tingling in the feet, abnormal position sense in the toes, and slight decreased breath sounds due to
17   smoking against treater recommendation.  (AR 19, 495, 536, 597, 614.)  However, objective
18   findings on examination by treating physicians have been otherwise generally within normal
19   limits.  (AR 19, 329, 384, 402, 538, 539, 597, 599, 601, 603, 615, 616.)  The record demonstrates
20   normal heart rhythm and EKG, no evidence of any coronary artery disease, normal chest x-rays
21   and x-ray computed tomography ("CT"), lungs clear to auscultation bilaterally, normal gait
22   without the use of an assistive device, normal muscle tone and bulk, negative straight leg raise,
23   and no focal neurological findings with normal motor and sensory exam.  (AR 19, 333, 351, 352,
24   354, 383, 384, 406, 493-495, 601, 631, 639-640, 646-647, 649, 661, 663, 664, 677, 679.)
25   Plaintiff had no difficulty getting on and off the examination table or taking off or putting on her
26   shoes.  (AR 19, 493.)

27        There is substantial support for the ALJ's determination that Plaintiff's allegations
28   regarding the severity of her limitations are not supported by the objective evidence in the

medical record.

2.     Daily Activities

There are two ways for an ALJ to "use daily activities to form the basis of an adverse credibility determination: if the claimant's activity contradicts his testimony or if the claimant's activity meets the threshold for transferable work skills." Phillips v. Colvin, 61 F. Supp. 3d 925, 944 (N.D. Cal. 2014).   Here, in addressing credibility, the ALJ found that Plaintiff's daily activities are inconsistent with the functional limitations to the degree alleged.  (AR 19.)

The ALJ did not consider that Plaintiff's activities met the threshold for transferable work skills, but that her activities contradict her testimony regarding her limitations.  Plaintiff alleges that due to her anxiety, high blood pressure, back pain, chest pain, and COPD she is unable to work.  The ALJ considered that Plaintiff is able to perform independent personal care with no problems, help her daughter clean, cook, wash laundry and do dishes, go outside, ride in a car, shop in stores for thirty minutes twice a month, manage her finances, read, watch television, bead, sew, live with a roommate, maintain intact relationships with family, visit with her grandchildren and daughter, and attend church weekly.  (AR 19.)

On May 31, 2011, Plaintiff reported to Dr. Vesali that she lives with a roommate, drives a car, shops for groceries, cooks, and cleans her room.  (AR 492.)  On July 19, 2011, Plaintiff told Dr. Prince that she is able to complete normal daily activities, such as showering, cleaning, washing clothes, and prepare simple meals.  (AR 509.)  Plaintiff visits with her grandchildren and daughter.  (AR 509.)  Her social relationships with her family are intact.  (AR 509.)

Plaintiff completed a function report on May 25, 2012.  (AR 276-283.)  Plaintiff reported that she gets up in the morning, gets breakfast, and if she is not having chest pains she helps her daughter clean.  (AR 276.)  Plaintiff eats lunch and then watches television, goes outside for a while, sometimes takes a nap or watches television until dinner.  (AR 276.)  She watches more television until she goes to bed.  (AR 276.)  Plaintiff stated she has panic attacks that wake her up and then she has trouble getting back to sleep.  (AR 277.)  Plaintiff has no problems with personal care.  (AR 277-278.)  Plaintiff prepares her own meals.  (AR 278.)  Plaintiff does laundry and dishes.  (AR 278.)  Plaintiff can do a task for 20 minutes and then rests for about 15

minutes before going back to work. (AR 278.) Plaintiff goes outside five to six times per day. (AR 279.) Plaintiff walks and rides in a car, but does not drive or go out alone because of panic attacks. (AR 279.) Plaintiff goes shopping for food twice per month. (AR 279.) Plaintiff is able to handle her finances. (AR 279.) Plaintiff's hobbies are reading, beading, sewing, and watching television. (AR 280.) Plaintiff watches television every day, but has not had the desire to do other things lately. (AR 280.) Plaintiff goes to church every Sunday with her daughter. (AR 280.) Plaintiff does not have problems getting along with others. (AR 281.) Plaintiff is able to pay attention for as long as needed. (AR 281.) Plaintiff finishes what she starts. (AR 281.) Plaintiff's ability to follow written and spoken instructions and get along with authority figures is good. (AR 281-282.)

At the February 6, 2014 hearing, Plaintiff reported that she lives with her daughter. (AR 46.) Plaintiff does housework such as dishes, vacuuming, and laundry. (AR 43.) She has to climb two steps to get into her house. (AR 44.)

Plaintiff alleges that she is able to perform activities for fifteen minutes and then needs to rest for twenty minutes due to her feet or back pain. However, even where a claimant's daily activities suggest some difficulty functioning, those activities may be grounds to discredit a claimant's testimony to the extent that they contradict claims of a totally disabling impairment. Molina, 674 F.3d at 1113. While Plaintiff's daily activities suggest that she does have some limitations, her daily activities are inconsistent with her allegations that she is totally disabled. The ALJ properly considered that Plaintiff's relatively intact daily activities contradicts her statements regarding the severity of her symptoms. See Burch, 400 F.3d at 681 (affirming ALJ's finding that ability to care for personal needs, cook, clean, shop, interact with nephew and boyfriend, and manage finances suggests claimant is quite functional).

### 3. Being Fired From Last Position

The ALJ also noted that Plaintiff stopped working significantly prior to her alleged onset date and admitted that she was fired from her last job and stated that she looked for work since she was fired in 2009. (AR 19-20.) The ALJ found that this suggests that Plaintiff's current unemployed status is not due to her functional limitations and she has a greater capacity for work

1    activity than she alleges.  (AR 20.)  Plaintiff testified that she stopped working due to being fired

2    and also that she stopped working because of her disability.  (AR 45, 255.)

3           Plaintiff admitted that she stopped working on February 1, 2009 when she was fired from

4    her position because her employer did not like the way she performed her job.  (AR 255.)  While

5    Plaintiff alleges that her health was declining at the time that she was fired from her position,

6    Plaintiff looked for work after she stopped working in 2009 but was unable to find work.  (AR

7    51.)

8           Substantial evidence supports that ALJ's finding that Plaintiff did not stop working due

9    to a disability, but because she was fired from her last position her current unemployment is

10   because she was unable to find work, rather than due to a disability.

11          4.    Lack of Compliance

12          The ALJ's also found that Plaintiff had a history of noncompliance with medication, and

13   breathing difficulties that have coincided with that noncompliance and has continued to smoke

14   cigarettes and marijuana despite her treating provider's recommendations to quit smoking.  A

15   claimant's unexplained failure to seek treatment or follow a prescribed treatment can be

16   considered in determining the claimant's credibility.  Orn, 495 F.3d at 638; see 20 C.F.R. §

17   404.1530(b) ("If you do not follow the prescribed treatment without a good reason, we will not

18   find you disabled. . . .")

19          In this instance, Plaintiff's failure to take her medication was due to a lack of insurance

20   and the need to save money in order to purchase the medication.  Plaintiff's lack of financial

21   resources to obtain her medication is a good reason for her failure to comply.  Therefore,

22   substantial evidence does not support the adverse credibility finding due to lack of compliance in

23   taking her prescribed medication.

24          However, the ALJ also made an adverse credibility finding due to Plaintiff's failure to

25   quit smoking cigarettes and marijuana.  Courts throughout the Ninth Circuit have found that the

26   failure to quit smoking against medical advice where the alleged disabling condition is

27   aggravated by smoking undermines the credibility of the claimant's subjective complaints.  Jones

28   v. Colvin, No. 1:14-CV-01991-JLT, 2016 WL 816484, at *8 (E.D. Cal. Mar. 2, 2016) (collecting

1  cases).  Here, the record demonstrates that as early as 2010 Plaintiff's physicians counseled her

2  on the importance of quitting smoking and drug use due to her cardiac condition and COPD.

3  (AR 410, 537, 541, 546, 553, 617.)  While Plaintiff argues that the most recent records show that

4  Plaintiff had decreased her smoking and eventually stopped smoking, it is reasonable for the ALJ

5  to assume that if Plaintiff's cardiac and COPD conditions were as severe as she alleged then it

6  would have been reasonable to follow the advice of her physicians.  Jones, 2016 WL 816484, *9.

7  The fact that Plaintiff continued to smoke cigarettes and marijuana for years against the advice of

8  her doctors supports the adverse credibility finding.

9       The Court finds that the ALJ has set forth clear and convincing reasons for the adverse

10  credibility finding that are supported by substantial evidence in the record.

11       **B.     Dr. Wallach's Opinion**

12       In the discussion on Plaintiff's credibility, Plaintiff argues that the ALJ erred in the

13  weight given to Dr. Wallach's opinion.  Defendant counters that the ALJ properly found that the

14  opinions of Drs. Shibuya and Balskowski best comported with the record as a whole.  Plaintiff

15  replies that the ALJ erred in failing to give any weight to the opinion of Dr. Wallach.[2]

16       The weight to be given to medical opinions depends upon whether the opinion is

17  proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d

18  821, 830-831 (9th Cir. 1995).  In general a treating physician's opinion is entitled to greater

19  weight than that of a nontreating physician because "he is employed to cure and has a greater

20  opportunity to know and observe the patient as an individual."  Andrews v. Shalala, 53 F.3d

21  1035, 1040-41 (9th Cir. 1995) (citations omitted).  Similar to a treating physician, the opinion of

22  an examining doctor, even if contradicted by another doctor, can only be rejected for specific and

23  legitimate reasons that are supported by substantial evidence in the record.  Lester, 81 F.3d at

24  831 (9th Cir. 1995).  Greater weight is afforded to the opinion of an examining physician than a

25  non-examining physician.  Andrews, 53 F.3d at 1041.  This does not mean that the opinions of

26

27  [2] While it is unclear from Plaintiff's complaint if she intended to raise a challenge to the weight given the medical opinion, Defendant has addressed the issue and Plaintiff has responded.  Accordingly, the Court shall consider the issue.

28

non-examining physicians are entitled to no weight; these opinions may serve as substantial evidence where they are supported by and consistent with other evidence in the record. Id. at 1041.

Plaintiff challenges the weight the ALJ provided to Dr. Wallach's opinion arguing it was entitled to controlling weight because he is a cardiac specialist. The Social Security regulations provide guidance on the evaluation of opinion evidence. See 20 C.F.R. § 404.1527. In determining the weight to give to medical opinions, every medical opinion is to be evaluated and unless given controlling weight because of a treatment relationship, section 404.1527(c) sets forth the factors to be considered in deciding the weight to be provided to an opinion. These factors include the examining or treatment relationship, supportability, consistency, specialization, and other factors. 20 C.F.R. § 404.1527(c). So while the specialty of the provider is a consideration, the ALJ can also consider other factors in deciding the weight to afford to the contrary opinions in the record.

The ALJ gave weight to the opinions of consultative examiner Dr. Fariba Vesali and State agency consultant Dr. Ronald Davis. (AR 20.) The ALJ found these opinions to be generally consistent with the largely normal and mild objective findings since the alleged onset date, and therefore, found they were entitled to some weight. (AR 20.)

Dr. Vesali performed a comprehensive neurological evaluation on March 31, 2011. (AR 492-496) Plaintiff reported her present illness to be low back pain since an auto accident in 2004 and no feeling in her feet for five years. (AR 492.) Dr. Vesali found Plaintiff to be alert and oriented, and able to follow three step commands with no difficulties. (AR 493.) Plaintiff had no difficulties getting on or off the examination table or taking off and putting on her shoes. (AR 493.) Dr. Vesali noted that Plaintiff walks with a normal gait. (AR 492.) Coordination/Station/Gait testing was performed. (AR 493.) Romberg and Tandem testing was negative. (AR 492.) Finger-nose test, repetitive alternating hand movements, and heel-knee tests were normal. (AR 492.)

Plaintiff's range of motion was normal. (AR 493.) Straight leg raising test in the seated position were normal. (AR 494.) In the supine position, Plaintiff complained of low back pain

1   with no radiation to the leg at 80 degrees hip flexion.  (AR 494.)  Plaintiff had tenderness on the

2   mid thoracic and lumbosacral spine.  (AR 494.)  Plaintiff had 5/5 motor strength bilateral in the

3   upper and lower extremities.  (AR 494.)  Plaintiff had normal muscle bulk and tone in bilateral

4   upper and lower extremities.  (AR 495.)

5       Plaintiff had decreased pinprick below the knees, decreased light tough sensation and

6   tingling sensation in feet; otherwise there was normal light touch and pinprick sensation in

7   bilateral upper and lower extremities.  (AR 494.)  Plaintiff had abnormal position sense in the

8   toes.  (AR 495.)  Plaintiff's deep tendon reflexes were 2+ and symmetrical in bilateral upper

9   extremities and knees and 1+ in bilateral ankles.  (AR 495.)  Dr. Vesali diagnosed Plaintiff with

10  possible neuropathy in lower extremities.  (AR 495.)

11      Dr. Vesali found that per the EMG report and nerve conduction report provided, Plaintiff

12  had severe bilateral peroneal motor neuropathy.  (495.)  Dr. Vesali opined that Plaintiff is able to

13  walk and stand six hours in an eight hour day with normal breaks due to the neuropathy in

14  bilateral lower extremities.  (AR 495.)  Plaintiff could sit with no limitations; carry 50 pounds

15  occasionally and 25 pounds frequently.  (AR 495.)  Plaintiff could frequently climb, stoop, kneel,

16  crouch, and crawl.  (AR 495.)  Plaintiff had no manipulative or environmental limitations.  (AR

17  495.)  The ALJ properly provided more weight to the opinion of Dr. Vesali who examined

18  Plaintiff.  Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001).

19      The weight to be afforded to a non-examining physician's medical opinion depends upon

20  the degree to which the physician provides explanations to support his opinion.  Garrison v.

21  Colvin, 759 F.3d 995, 1012 (9th Cir. 2014).  In this instance, the ALJ considered the opinions of

22  multiple non-examining physicians.

23      Dr. Davis completed a residual functional capacity assessment on June 15, 2011.  (AR

24  504.)  Dr. Davis found that Plaintiff could occasionally lift 50 pounds and frequently lift 25

25  pounds.  (AR 498.)  Plaintiff could stand, walk, and sit for about 6 hours in an 8 hour workday.

26  (AR 498.)  Plaintiff was unlimited in her ability to push and/or pull.  (AR 498.)  Plaintiff had no

27  postural, manipulative, visual, communicative, or environmental limitations.  (AR 498-501.)  Dr.

28  Davis opined that considering the diagnosis of neuropathy, CAD/nonspecific chest pain, the

1    longitudinal evidence of treatment sought and given, and the credible activities of daily living,

2    Plaintiff would have a medium RFC.  (AR 504.)  Similarly, the ALJ found that the opinion of Dr.

3    Davis was consistent with the evidence in the record.

4         The ALJ provided significant weight to the opinions of the State agency medical

5    consultants who opined that Plaintiff was able to perform light work with no climbing of ladders,

6    ropes or scaffolds; occasional other postural activities; and no concentrated exposures to fumes,

7    odors, dusts, gasses, poor ventilation, and other inhaled irritants because they were generally

8    consistent with the objective clinical findings and adequately addressed Plaintiff's subjective

9    complaints regarding her neuropathy, back pain, cardiomyopathy, and obesity.  (AR 20.)  In the

10   disability determination explanation for Plaintiff, the objective physical and mental findings were

11   considered.  (AR 70-71.)  Plaintiff was found to have stable cardiomyopathy with compensated

12   congestive heart failure, peroneal neuropathy but can walk normally, and back pain with normal

13   range of motion and neuromuscular function.  (AR 73.)

14        On June 2, 2012, Dr. Shibuya found that Plaintiff had high blood pressure and

15   cardiomyopathy likely related to her methamphetamine use.  (AR 75.)  Plaintiff was recently

16   admitted for congestive heart failure and COPD exacerbation.  (AR 75, 546, 536.)  After

17   treatment she was stable with no congestive heart failure or angina complaints, physical

18   examination was normal and ongoing improvement was expected.  (AR 75, 541, 597.)  Plaintiff

19   has chronic back pain without radiculopathy and examination reveals tenderness with normal

20   range of motion.  (AR 75, 494.)  Left extremity strength and gait are normal and reflexes are

21   symmetric.  (AR 75, 492, 494-495.)  Plaintiff has sensory neuropathy of uncertain etiology.  (AR

22   75.)  Sensation below her knees is reduced to light touch and proprioception.  (AR 75, 495.)

23   Ankle jerks were slightly diminished and EMG/NCV study confirmed bilateral peroneal

24   neuropathies.  (AR 75, 495, 380-381.)  Plaintiff is obese.  (AR 75.)  COPD is mentioned but

25   minimally active.  (AR 75.)  Considering her ability to cook, clean, shop, and drive, she has a

26   light residual functional capacity with postural restrictions.  (AR 75.)

27        On reconsideration, the agency physicians considered that Plaintiff had an additional visit

28   due to feeling haziness.  (AR 112, 634.)  Plaintiff's physical examination was normal.  ( AR

639.) ECHO and chest x-rays were normal. (AR 112, 661, 663, 664.) The finding was no significant change from the initial evaluation. (AR 112.) On June 25, 2013, Dr. Blaskowski found that Plaintiff's residual functional capacity remained the same. (AR 16.)

The ALJ provided Dr. Wallach's opinion little weight because Dr. Wallach was not a treating physician or examining source and the record documents little objective evidence of abnormal findings as of the alleged onset date. (AR 20.) The ALJ noted that Dr. Wallach first opined that Plaintiff met the listings, however, on further examination he recanted his earlier opinion and instead opined that Plaintiff was limited to sedentary work or less. (AR 20.) Dr. Wallach testified that Plaintiff had peripheral neuropathy and diastolic heart failure. (AR 47.) Originally, Dr. Wallach testified that Plaintiff would not meet the listing for diastolic heart failure, but would meet the listings for class II heart failure. (AR 47.) When the ALJ specifically referenced the medical records, Dr. Wallach reviewed the records and stated that Plaintiff did not meet the listing. (AR 47.) The ALJ pointed out that the listing requires disorganization of motor function and the record does not reflect such. (AR 48.)

Dr. Wallach opined that Plaintiff had symptoms that would make her class II heart failure. (AR 47.) The ALJ pointed to the most recent hospital records that showed minor severity of illness and otherwise normal function, and asked Dr. Wallach if that described class II heart failure. (AR 49.) Dr. Wallach responded, "Well, but she has got the diastolic dysfunction, which is, I think, causing her symptoms." (AR 49.) Dr. Wallach also noted that Plaintiff is on two heart medications. (AR 49.) When the ALJ asked what would define class II cardiac problems, Dr. Wallach responded that class I would be no symptoms and class II would be symptoms with moderate exercise. (AR 49.) Upon questioning by Plaintiff's counsel, Dr. Wallach opined that it would only be Plaintiff's heart condition, not her peripheral neuropathy, that would be the basis of sedentary work. (AR 50.)

Although Plaintiff argues that Dr. Wallach's opinion should be provided with controlling weight, the ALJ considered the medical record and opinions of the examining and non-examining providers and gave specific and legitimate reasons that are supported by substantial evidence in the record to reject the opinion of Dr. Wallach. Specifically, the ALJ considered that

the agency physicians reviewed the objective medical evidence in determining Plaintiff's residual functional capacity and their opinions were consistent with the objective medical evidence.  Dr. Wallach's opinion was based upon Plaintiff's symptoms and the ALJ found the opinion to be inconsistent with the objective medical findings.  While there is conflicting evidence in the record, where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.  Burch, 400 F.3d at 679.  The Court finds that the ALJ provided specific and legitimate reasons for the weight given to Dr. Wallach's opinion that are supported by substantial evidence in the record.

**V.**

**CONCLUSION AND RECOMMENDATION**

Based on the foregoing, the Court finds that the ALJ did not err in finding Plaintiff's testimony to be less than credible and in the weight assigned to the non-examining physician opinions.  Accordingly, IT IS HEREBY RECOMMENDED that Plaintiff's appeal from the decision of the Commissioner of Social Security be DENIED.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within fourteen (14) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __July 18, 2016__                                _____
                                                          UNITED STATES MAGISTRATE JUDGE